**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Clarendon National Insurance Company,

Plaintiff

v.

Lexington Insurance Company,

Defendant

Case No. 3:16CV1128

**ORDER**

This is an insurance dispute.

Plaintiff Clarendon National Insurance Company funded the defense of, and ultimately paid a settlement in, a civil-rights lawsuit filed against its insureds: the Lucas County, Ohio, Board of Commissioners; James Telb, a former Sheriff of Lucas County; and several former deputy sheriffs. The lawsuit, *Coley v. Lucas Cnty., et al.*, Case No. 3:08CV9 (N.D. Ohio), involved claims for, *inter alia*, excessive force, wrongful death, and conspiracy arising out of the death of Carlton Benton, a pretrial detainee who died in custody at the Lucas County Jail.

Clarendon now alleges that defendant Lexington Insurance Company, which also insured Lucas County and its agents, must contribute to the defense of, and the settlement in, the *Coley* litigation.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). (Doc. 17 at ¶¶2–4).

Pending are the parties' counter-motions for summary judgment. (Docs. 30, 32). For the following reasons, I grant Clarendon's motion and deny Lexington's motion.

## Background

## A. The Death of Carlton Benton

After Benton had received medical care on May 30, 2004, at a hospital in Toledo, sheriff's deputies returned him to the county jail. (*Coley* Cmplt. at ¶¶9–11). Benton, who had resisted the deputies while at the hospital, was wearing leg irons, handcuffs, and a belly chain. (*Id.* at ¶¶12, 15). As the deputies escorted Benton to the jail's medical wing, Deputy Jay Schmeltz, allegedly upset at Benton's earlier show of resistance, shoved Benton from behind, causing him to trip over his feet, knock his head against a wall, and fall on the floor. (*Id.* at ¶¶18–20).

Schmeltz and the other deputies picked Benton off the floor and proceeded to the medical wing. (*Id.* at ¶24). There Benton began to "squirm around" and "struggle" as the deputies placed him on a bed and tried to remove his restraints. (*Id.* at ¶27). Sergeant John Gray grabbed Benton from behind and put him in a choke hold. (*Id.* at ¶28). Benton began "to gasp for air, making choking and . . . gurgling sounds," but Gray did not release him. (*Id.* at ¶29). A few seconds later, Benton "went limp and was completely unconscious." (*Id.*). The deputies left the room and did not seek medical attention for Benton. (*Id.* at ¶¶31–32).

Ten minutes later, a deputy doing rounds entered Benton's cell and found him unconscious and not breathing. (*Id.* at ¶34). An ambulance took Benton to the hospital, where, on June 1, medical staff declared him brain dead. (*Id.* at ¶¶34–35).

The county coroner performed an autopsy and found no signs of trauma or foul play. (Doc. 32–1 at 8–9). Nor did the coroner detect damage to Benton's neck. (*Id.* at 8). In October, 2004, the coroner returned a verdict that Benton died of a seizure disorder associated with Welbutrin use. (*Id.* at 9).

Meanwhile, in early June, 2004, the Lucas County Corrections Administrator opened an internal-affairs investigation into Benton's death. (*Id.*).

The officer in charge, Captain Robert McBroom, interviewed the deputies who transported Benton from the hospital to the jail. (*Id.*). Schmeltz and Gray filed reports that made no mention of Schmeltz shoving Benton or Gray placing him in a choke hold. (*Coley* Cmplt. at ¶38). But another deputy, Pat Mangold, told McBroom that Benton had been "choked to death" by Sergeant Gray. (McBroom Dep. at 92).

Nevertheless, the county closed the investigation after the coroner reported that there were no signs of trauma to support Deputy Mangold's claim. (Doc. 32–1 at 9).

Four years later, in March, 2008, the county reopened the investigation when a former employee, Tina Anaya, alleged that Gray, Schmeltz, and others had been "jumping, and stomping and kicking and punching and smothering [Benton's] face and choking him." (Stipulated Exh. Q). This caused the coroner to opine that, had she previously known that a deputy placed Benton in a choke hold, she likely would have ruled Benton's cause of death "undetermined." (Beisser Dep. at 74–75). Ultimately, in 2010, the coroner revised her verdict to identify the cause of death as homicide. (Doc. 32–1 at 10).

County prosecutors referred the matter to the Federal Bureau of Investigation. During that investigation, 1) Schmeltz told FBI agents that he did not see Gray use a choke hold; 2) Gray claimed that he saw Benton moving and breathing after he released him from the choke hold; and 3) Telb – who allegedly knew that Gray choked Benton to death and lied about it – denied that Gray had used a choke hold.

## B. The *Coley* Litigation

In their second amended complaint the *Coley* plaintiffs asserted seven claims:

- Count One:     Wrongful death against Gray, Schmeltz, Telb, and Lucas County.

- Count Two:     Deprivation of constitutional rights under 42 U.S.C. §§ 1983 and 1985 and conspiracy to deprive constitutional rights against Grey, Schmeltz, McBroom, Telb, and Lucas County. This count depended on the use of excessive force while the defendants dealt with Benton in the jail, defendants' deliberate indifference to Benton's medical needs, and the defendants' failure to train Lucas County deputy sheriffs not to use excessive force.

- Count Three:   Negligence/recklessness/bad faith against Gray, Schmeltz, Telb, and Lucas County arising out of defendants' breach of their duty "not to place [Benton's] life in doubt."

- Count Four:    Assault and battery against Gray, Schmeltz, Telb, and Lucas County.

- Count Five:    Intentional infliction of emotional distress against Gray, Schmeltz, Telb, and Lucas County.

- Count Six:     Loss of consortium against Gray, Schmeltz, Telb, and Lucas County.

- Count Seven:   Aiding and abetting, civil conspiracy, and civil Racketeer Influenced and Corrupt Organizations claims against Gray, Schmeltz, McBroom, Telb, and Lucas County.

(*Coley* Cmplt. at ¶¶57–100).

To avoid statute-of-limitations objections, the plaintiffs alleged they did not discover the

*Coley* defendants' misconduct until 2008, when the cover up surrounding Benton's death unraveled:

Plaintiffs never were aware, nor reasonably could have been aware, that Carlton Benton was the victim of any wrongful, offensive, or unconstitutional force, conduct, or omission or that his death was caused by some wrongful act, until March 2008 when [plaintiffs] received a call from Tina Anaya Hill "telling [us] that he was beaten and choked while he was in custody."

(Doc. 31–1 at 24; *see also Coley* Cmplt. at ¶58).

In August, 2016, the parties settled. The claims remaining at the time of settlement were:

- Count One – Wrongful Death against Schmeltz, Gray, Telb, and Lucas County.

- Count Two – § 1983 claim against Schmeltz, Gray, Telb, and Lucas County.

- Count Three – Negligence/recklessness/bad faith against Lucas County.

- Count Four – Assault and battery Schmeltz, Gray, and Lucas County.

- Count Five – Intentional infliction of emotional distress against Lucas County.

- Count Six – Loss of consortium against Lucas County.

- Count Seven – Aiding and abetting, civil conspiracy, and civil RICO against the County

(Doc. 32–1 at 12).

## C. The Insurance Dispute

### 1. The Policies

Clarendon issued a Municipal Retained Amount policy to Lucas County that was effective from January 1, 2004, until January 1, 2005. The policy contained a $5 million aggregate limit and a $500,000 "Retained Amount" (i.e., a deductible).

Lexington, in contrast, issued Municipal Retained Amount policies to Lucas County for the periods of April 1, 2007, to April 1, 2008, and April 1, 2008, to April 1, 2009. Like the Clarendon policy, each Lexington policy had a $5 million limit and a $500,000 Retained Amount.

Three features of Lexington's policy are critical here.[1]

---

[1] Because I conclude that only Lexington's 2007–2008 policy requires it to indemnify Lucas County, I refer throughout this opinion to that policy. For the reader's convenience, moreover, I have omitted the bold-face type that Lexington uses throughout the policy.

First, the policy's "Insuring Agreement" provides that Lexington "will pay on behalf of the Insured that portion of the Ultimate Net Loss in excess of the Retained Amount or Other Insurance, whichever is greater, which the Insured becomes legally obligated to pay as damages and related Claims Expenses because of Bodily Injury, Property Damage, Personal and Advertising Injury or Public Officials' Errors or Omissions." (Doc. 10–2 at 146).[2]

Under the policy, "Other Insurance" means "any other insurance paid on behalf of the Insured for damages which affords coverage with respect to injury, damages or acts to which this policy also applies." (*Id.*).

Second, coverage under the Lexington policy for "Public Officials' Errors and Omissions" is available only for "such damages that are caused by a Wrongful Act that is first discovered or becomes manifest during the Policy Period." (*Id.*). The policy defines "Public Officials' Errors and Omissions" as "any and all Wrongful Acts by an Insured in the performance of their duties for the Named Insured." (*Id.* at 121). A "Wrongful Act," in turn, means "any actual or alleged error or misstatement, omission, act of neglect or breach of duty or actual or alleged violation of federal or state civil rights." (*Id.* at 122).

Third, the Lexington policy does not cover "Public Officials' Errors and Omissions arising out of Bodily Injury[.]" (*Id.* at 113). The term "Bodily Injury" refers to "bodily injury, sickness or disease sustained by a person." (*Id.* at 117). It also includes "death" when "resulting from such bodily injury, sickness or disease." (*Id.*).

---

[2] The Insuring Agreement, as well as the policy's definition of "Other Insurance" that I discuss below, appear in an endorsement to the Lexington policy. (Doc. 10–2 at 146–47). Under Ohio law, courts "read the endorsement as if its terms were printed within the body of the general policy." *Penn Traffic Co. v. AIU Ins. Co.*, 99 Ohio St. 3d 227, 231 (2003).

## 2. Earlier Proceedings

In December, 2008, Lucas County tendered the *Coley* litigation to Clarendon for defense and indemnification. (Doc. 9 at ¶4). Clarendon accepted the tender subject to a reservation of rights, though it advised Lucas County that its obligations under the policy would not arise until the county satisfied the policy's $500,000 retained amount. (Stipulated Exh. U at 9).

Lucas County's legal expenses exceeded the retained amount in early or mid-June, 2016. (Stipulated Exh. AT at 1). Thereafter, Clarendon paid $213,991.42 in litigation expenses and $1,280,000.00 to settle the case. (Doc. 31–1 at ¶¶39–40).

Meanwhile, in February, 2015, Lucas County also demanded that Lexington cover the *Coley* litigation. (Stipulated Exh. AE). Lexington refused, however, as it likewise refused Clarendon's subsequent demand for contribution. That refusal gives rise to this lawsuit.

## 3. Clarendon's Claims

Clarendon's complaint raises a claim for equitable contribution and requests that I issue a declaratory judgment that Lexington must contribute to the expenses incurred in, and the settlement of, the *Coley* litigation. (Doc. 9 at ¶¶24–35).

### a. Equitable Contribution

"The aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the other." 16 Couch on Insurance § 222:98.

"Under Ohio law, courts may allocate liability among multiple insurers in certain contexts, such as when all insurers at issue provide primary coverage or when all provide second-tier excess coverage." *IMG Worldwide, Inc. v. Great Divide Ins. Co.*, 704 F. App'x 562, 566 (6th Cir. 2017).

"Contribution, when it exists, is the right of a person who has been compelled to pay what another should pay in part to require partial (usually proportionate) reimbursement and arises from principles of equity and natural justice." *Travelers Indem. Co. v. Trowbridge*, 41 Ohio St. 2d 11, syllabus ¶2 (1975), *overruled on other grounds by Motorists Mut. Ins. Co. v. Huron Rd. Hosp.*, 73 Ohio St. 3d 391 (1995).

### b. Declaratory Judgment

Under the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

"[T]he Declaratory Judgment Act only provides courts with discretion to fashion a remedy in cases where federal jurisdiction already exists, and therefore, the Court must have an independent basis for subject matter jurisdiction." *Mesa Underwriters Specialty Ins. Co. v. Myers*, 2016 WL 4367079 (N.D. Ohio). Here, I have diversity jurisdiction, and I conclude that issuing a declaratory judgment is consistent with the five *Grand Trunk* factors. *See Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

### Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, parties have filed cross-motions for summary judgment, the Court grants or denies each motion for summary judgment on its own merit, applying the standards described in Fed. R. Civ. P. 56." *Williams v. Ohio Dep't of Rehab. & Corrs.*, 2018 WL 500167, *1 (S.D. Ohio).

## Discussion

The parties' counter-motions raise identical issues: 1) whether Lexington is an excess insurer as to the *Coley* litigation, such that its duty to indemnify arises only if Clarendon first exhausts its policy limits; 2) whether one or more "Wrongful Acts" were "first discovered or bec[a]me[ ] manifest" during the Lexington policy period, thereby triggering the grant of coverage for "Public Officials' Errors and Omissions"; 3) whether the exclusion in Lexington's policy for "Public Officials' Errors and Omissions arising out of Bodily Injury" relieves Lexington of any duty to indemnify; and 4) whether one or both of Lexington's policies respond to the *Coley* litigation.

### A. Whether Lexington Is an Excess Insurer

Lexington first argues that it is an excess insurer *vis-a-vis* the claims in the *Coley* litigation. (Doc. 30–1 at 16–22). This argument relies on language in the policy's "Insuring Agreement" stating that Lexington will pay "that portion of the Ultimate Net Loss *in excess of the Retained Amount or Other Insurance, whichever is greater*" that its insured becomes obligated to pay. (Doc. 10–2 at 146) (emphasis supplied).

According to Lexington, this language means that it has no obligation to cover a claim "unless and until the greater of the 'Retained Amount' or 'Other Insurance' is properly exhausted." (Doc. 30–1 at 17) (internal emphasis omitted). Because Clarendon's policy qualifies as "Other Insurance," and because Clarendon paid only about $1.5 million of its $5 million policy limit, Lexington argues that it has no obligation to contribute to the *Coley* litigation.

Clarendon responds that Lexington is a co-primary insurer, not an excess insurer, as to the *Coley* litigation.

It relies on the Lexington policy's definition of "Other Insurance" as "any other insurance *paid on behalf of the insured for damages* which affords coverage with respect to injury, damage or acts to which this policy also applies." (Doc. 10–2 at 146) (emphasis supplied). According to Clarendon, an insurance policy is not "Other Insurance" unless it has, in fact, paid damages on behalf of the insured; absent such a payment, Clarendon contends, the other policy does not qualify as "Other Insurance."

Because Clarendon had not made any payments on Lucas County's behalf as of either early or mid-June, 2016 (when Lucas County exhausted its deductible) or August 22, 2016 (when the *Coley* plaintiffs accepted the offer of judgment and settled the case), Clarendon argues that its policy is not "Other Insurance."

## 1. Rules for Interpreting an Insurance Policy

"The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in its entirety and to settle upon a reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect." *Laboy v. Grange Indem. Ins. Co.*, 144 Ohio St. 3d 234, 236 (2015).

"In the absence of an express contractual definition or resultant manifest absurdity, [a court] will construe words and phrases contained in an insurance policy in accordance with their plain and ordinary meaning." *Lightening Rod Mut. Ins. Co. v. Southworth*, 2016-Ohio-3473, ¶21 (Ohio App.). "If an insurance contract is plain and unambiguous, the court does not go beyond the plain language of the policy to determine the parties' rights and obligations; instead, it gives effect to these plain and unambiguous terms." *Id.* at ¶22.

When two policies arguably cover the same risk, "it is the policy language explaining the relationship of the insurance coverage in one policy to insurance coverage in another policy . . . which is the most important factor in determining the existence of a primary insurer." *Meridian Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 1998 WL 1966426, *5 (S.D. Ohio).

### 2. The Nature of an Excess Policy

"An excess policy provides specific coverage above an underlying limit of primary insurance." *Griewahn v. U.S. Fid. & Guar. Co.*, 160 Ohio App. 3d 311, 318 (2005).

"Excess insurance is priced on the assumption that primary coverage exists; indeed, an excess policy usually requires by its terms that the insured maintain in force scheduled limits of primary insurance." *Id.* "In keeping with the reasonable expectations of the parties, including the insured, which paid separate premiums for its primary and excess policies, excess coverage is generally not triggered until the underlying primary limits are exhausted by way of judgments or settlements." *Id.*

The case law suggests that excess policies usually specify the types of "other insurance" to which they are excess. For example, an excess policy might state that, "[i]f a loss covered by this policy is also covered by other insurance, we will pay only for the amount of covered loss in excess of the amount due from that other policy, whether you can collect on it or not." *DiSanto v. Safeco Ins. of Am.*, 168 Ohio App. 3d 649, 657 (2006). An excess policy might also contain a schedule of other insurance policies held by the insured and provide that it is excess over those policies.

### 3. Lexington's Policy Is Not Excess to Clarendon's Policy

Given the specific definition of "Other Insurance" in the Lexington policy, I conclude that the Clarendon policy does not qualify as "Other Insurance," and that the Lexington policy is therefore not excess to the Clarendon policy.

The Lexington policy defines "Other Insurance" with express reference to sums already paid on behalf of the insured for damages the insured has incurred: "Other Insurance means any other insurance *paid on behalf of the insured for damages* which affords coverage with respect to injury, damages or acts to which this policy also applies." (Doc. 10–2 at 146) (emphasis supplied). Here, however, it is undisputed that when Lexington's coverage obligations arose, Clarendon had not "paid on behalf of [Lucas County] for damages[.]" Thus its policy is not "Other Insurance" under the Lexington policy, and Lexington's policy is not excess to the Clarendon policy.

I granted Lexington leave to file a sur-reply addressing this issue in greater detail (non-document entry of Feb. 15, 2018), but the arguments it put forth are unconvincing.

Lexington contends that focusing on "the past-tense term 'paid' ignores the import of the term in the context of the Lexington policies' 'Insuring Agreement.'" (Doc. 35 at 2). According to Lexington, the Insuring Agreement "contemplates a *prospective* obligation" to pay damages that its insured becomes obligated to pay in the future. (*Id.*) (emphasis in original). But focusing on the term "paid" would, in Lexington's view, "have the effect of removing the clause 'or Other Insurance, whichever is greater,' subject to the other insurer's timing in writing a check[.]" (*Id.* at 3).

That conclusion does not follow from Lexington's premise.

Lexington is correct, of course, that the Insuring Agreement contemplates a prospective obligation. The policy guarantees that if Lucas County "becomes legally obligated to pay . . . damages" that the policy covers, Lexington will pay that portion of the damages that is "in excess of . . . Other Insurance." (Doc. 10–2 at 146). But pointing out the prospective nature of this obligation does not answer the question whether a given loss that occurs in the future is "in excess of . . . Other Insurance."

Lexington told Lucas County that it would act as an excess insurer only if a given loss were "excess to . . . other insurance paid on behalf of [the county] for damages[.]" Because Clarendon's policy had not "paid on behalf of the insured for damages" owed in the *Coley* litigation, that policy is not "Other Insurance."

Rather than confronting the significance of the "Other Insurance" definition, Lexington falls back on public-policy concerns.

It contends that interpreting "Other Insurance" to encompass only those policies that have already paid damages on behalf of the insured "would create a perverse incentive for [another] insurer" to delay paying a loss in the hopes that an ostensible excess insurer "could be 'brought in' as a co-primary insurer." (Doc. 35 at 3). Even if that were true, however, the incentive would arise, not from my adoption of an otherwise debatable construction of Lexington's policy, but from the way Lexington chose to define "Other Insurance."

On this score it is worth noting that Lexington has not cited a single case involving an insurance policy with a similar definition of "other insurance."

I searched for such a case, moreover, but I could not find one.

To the contrary, the policies in the cases I reviewed tended to define "other insurance" as an insurance policy that is simply "available to" an insured – regardless of whether the policy has also "paid on behalf of the insured for damages[.]" *E.g.*, *In re Viking Pump, Inc.*, 148 A.3d 633, 661 (Del. 2016) ("other insurance means any other valid and collectible insurance . . . which is available to the Insured"); *Jensen v. Bd. of Regents of Univ. of Nebraska*, 684 N.W.2d 537, 540 (Neb. 2004) ("Other insurance means any reimbursement for or recovery of any element of Covered Loss available from any other source whatsoever"); *Coffeyville Res. Refining & Mktg., LLC v. Liberty Surplus Ins. Corp.*,

714 F. Supp. 2d 1119, 1127 (D. Kan. 2010) ("Other Insurance means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."); *see also DiSanto*, *supra*, 168 Ohio App. 3d at 657 (policy was excess to "the amount due from that other [insurance] policy, whether you can collect on it or not"); *Carmel Dev. Co. v. RLI Ins. Co.*, 126 Cal. App. 4th 502, 511 (2005) (policy was excess over all "scheduled underlying insurance" and any "unscheduled underlying insurance").

These cases, and their more or less uniform definition of "other insurance" as any insurance policy that is merely "available to" the insured, reinforce my conclusion that Lexington's policy refers to a narrower set of policies that have "paid on behalf of the insured for damages." Because the Clarendon policy does not fit within that narrower set of policies, Lexington's policy is not excess to Clarendon's policy.

Finally, Lexington contends that this construction of "Other Insurance" would render another part of the policy meaningless.

Lexington points to a separate "Other Insurance" provision stating that "[i]f there is any Other Insurance available to the insured which affords coverage with respect to injury, damages or acts to which this policy applies, this policy shall apply as excess of and shall not contribute with such other insurance." (Doc. 10–2 at 147).[3] According to Lexington, if "Other Insurance" includes only those policies that have "paid on behalf of the insured," this clause "would never apply because

---

[3] By means of this kind of "Other Insurance" clause, an insurer tries to "eliminate or limit [its] obligation to provide coverage when there is also available other insurance that covers the insured for the same loss." Baldwin's Ohio Insurance Coverage § 8.4; *see also Nationwide Fire Mut. Ins. Co.*, 2002-Ohio-6186, ¶11 (Ohio App.) ("'Other Insurance' clause merely apportions and prioritizes a loss when there is more than one primary policy in issue").

there could never be 'Other Insurance' merely '*available*' to the insured." (Doc. 35 at 3) (emphasis in original).

This argument lacks merit.

For one thing, I am not convinced that the provision would, in fact, be a nullity. Rather, this "Other Insurance" clause would, like its counterpart in the Insuring Agreement, simply apply in a more limited set of cases, given the narrow definition of "Other Insurance." More importantly, any such problem – which this case does not even present – flows directly from the Lexington policy's seemingly peculiar definition of "Other Insurance." Accordingly, I will not ignore the policy's definition of "Other Insurance" and thereby relieve Lexington of its obligation to cover the *Coley* litigation in order to avert a hypothetical problem that may or may not arise in an entirely different context.

Because Clarendon's policy is not "Other Insurance" under the Lexington policy, Lexington is not an excess insurer as to the *Coley* litigation.

### B. Whether a Wrongful Act Was "First Discovered or Bec[a]me[ ] Manifest" During the Lexington Policy Period

Clarendon argues that Lexington has an obligation to indemnify Lucas County because its policy covers damages that are "because of . . . Public Officials' Errors and Omissions." (Doc. 10–2 at 106). Coverage is available under that section, however, only if the damages are "caused by a Wrongful Act that is first discovered or becomes manifest during the Policy Period" – i.e., from April 1, 2007, until April 1, 2009. (Doc. 10–2 at 106).

### 1. Parties' Arguments

Lexington argues that the wrongful acts that caused or contributed to Benton's death – Schmeltz's shoving of Benton from behind, Gray's use of a choke hold, and the collective failure to treat Benton – manifested "at the time of [Benton's] death" in 2004. (Doc. 30–1 at 23). According to Lexington, Benton's death "was the ultimate 'manifestation' of each alleged 'Wrongful Act' leading up to and causing his death." (*Id.*).

Clarendon responds that, even if the wrongful acts first became manifest in 2004, Lexington still must cover the *Coley* litigation because those acts were also "first discovered" in 2008. (Doc. 32–1 at 29–30).

According to Clarendon, "the wording of the grant of coverage" for Public Officials' Errors and Omissions "is in the disjunctive," such that coverage exists not only when a wrongful act first manifests during the policy period, but also when a wrongful act is first discovered during the policy period – regardless of whether a wrongful act also manifested earlier. (Doc. 32–1 at 29).

Relying on the *Coley* plaintiffs' allegations that they did not discover the wrongful acts until 2008 – when Lucas County employee Tina Anaya exposed the cover-up surrounding Benton's death – Clarendon argues that the wrongful acts were "first discovered" during the Lexington policy period.

In reply, Lexington contends that the wrongful acts were "discovered" in 2004 because those acts were "known . . . by the officers who committed and then purportedly sought to cover-up those alleged acts." (Doc. 33 at 18 n.8). It also argues that, because certain Lucas County employees beyond the perpetrators (most significantly, Tina Anaya) knew about the wrongful acts, I should impute that knowledge to the County. (*Id.* at 19).

## 2. Analysis

The critical issue is when are wrongful acts – here, the shove, the choke hold, and the failure to provide needed medical care, among others – "first discovered," or when do they "become[ ] manifest," particularly when those who committed the wrongful acts intend to, and do successfully, cover them up for a lengthy period of time. That issue turns on related subsidiary questions: whose discovery of the "Wrongful Acts" counts, and to whom must they "become[ ] manifest?"

Neither party has cited any Ohio case law – or, indeed, any relevant authority from any jurisdiction – to support its argument. Each side's position, moreover, begs the question at issue: Lexington asserts, without any authority, that the perpetrators' or the county's knowledge is dispositive, just as Clarendon assumes, without any authority, that the *Coley* plaintiffs' knowledge controls.

To resolve the issue, I consulted Ohio case law discussing the kinds of events that can trigger coverage under an insurance policy.

### a. Insurance Policies and Trigger Theories

The Ohio courts have several approaches for determining when coverage under an insurance policy is "triggered." *Lightening Rod*, *supra*, 2016-Ohio-3473 at ¶28. As the court explained in *Plum v. W. Am. Ins. Co.*, 2006-Ohio-452, ¶16 (Ohio App.):

> Under the "manifestation trigger," coverage is triggered when property damage becomes known to the owner. Under the "injury-in-fact trigger," coverage is triggered when the damage first occurs. Under the "exposure trigger," coverage is triggered when the first injury-causing conditions occur. Finally, courts often apply the concept of "continuous trigger" if multiple policies are in effect over a period of time.

Courts ordinarily apply these theories in cases involving "occurrence-based" liability policies, which "cover[ ] . . . damages *occurring* within the policy period." *Reynolds v. Celina Mut. Ins. Co.*, 2000 WL 202107, *3 (Ohio App.) (emphasis supplied). Because it is often debatable when damages "occur," the court must select the appropriate event that triggers coverage.

In contrast to those cases, Lexington's grant of coverage for Public Officials Errors' and Omissions is expressly manifestation- or discovery-based. Accordingly, I can ignore the three other triggers and focus on the manifestation trigger.

The Ohio cases applying the manifestation trigger suggest that the relevant party – the party whose discovery of the wrongful act or damages matters, and to whom such act or damage must manifest – is not the wrongdoer, but the "victim" of the wrongful act or the "owner" whose property is damaged. *See Plum*, *supra*, 2006-Ohio-452 at ¶16 ("Under the 'manifestation trigger,' coverage is triggered when property damage becomes *known to the owner*.") (emphasis supplied); *GenCorp, Inc. v. AIU Ins. Co.*, 104 F. Supp. 2d 740, 745 (N.D. Ohio 2000) ("If coverage is triggered when the property or personal injury becomes *known to the property owner or victim*, the trigger is identified as the manifestation trigger.") (emphasis supplied).

The manifestation trigger is thus unconcerned with when an injury happens, and with the knowledge of those whose actions produce the injury. It is instead concerned with situations where an injury occurs or happens at one point, but the ascertainable or identifiable damages flowing from that injury do not "manifest" or become apparent until a later date.

### b. Because of the Successful Cover-Up, the Wrongful Acts Were "First Discovered," and First "Became Manifest," in 2008.

Applying Ohio's manifestation trigger theory here, I conclude that the wrongful acts were "first discovered" and "bec[a]me[ ] manifest]" in March, 2008.

The wrongful acts and the injury they produced – Benton's death – occurred in 2004. But due to the *Coley* defendants' successful cover-up of their misconduct, those wrongful acts – and the actual cause of Benton's death – remained latent, hidden from public knowledge, and unknown to Benton's family, heirs, and estate.

Only with the disclosure to the *Coley* plaintiffs by Tina Anaya in March, 2008, that the defendants had choked Benton to death was there a "manifestation of that injury in ascertainable damage" – that Benton had died, not by natural causes, but by excessive force and failure to treat – "which form[ed] the basis for a claim against the insured." 7 Couch on Insurance § 102.24; *see also Cleveland Bd. of Educ. v. R.J. Stickle Int'l*, 76 Ohio App. 3d 432, 437 (1991) (recognizing that "where the resulting damage does not manifest itself until a period of time has passed and a new carrier is on the risk, the insurer on the risk when the first visible or discoverable manifestations of damage occur" is liable).

These considerations defeat Lexington's argument that Benton's death in 2004 was "the ultimate 'manifestation' of the wrongful acts."

Benton's death was, rather, the ultimate *consequence* of the wrongful acts. In no way did his dying, of its own force, manifest the wrongful acts that caused his death. Benton's death was just that: a death. Even the county coroner, after performing an autopsy and conducting a lengthy investigation, found no trauma or damage to Benton's neck – and thus remained unaware of what

had really transpired. Only when she learned about the key wrongful act – the choke hold – did she conclude that Benton had not, as previously thought, died of natural causes.

In short, the wrongful acts occurred in 2004, but the damages resulting from them were not discovered, and did not manifest themselves, until 2008. For that reason, I hold that the wrongful acts were "first discovered" and "bec[a]me[ ] manifest" in March, 2008, during the Lexington policy period.

### C. Whether the Wrongful Acts "Arise Out of Bodily Injury"

Lexington's policy insured Lucas County for "Public Officials' Errors or Omissions" that manifest during the policy period, but an exclusion precludes coverage for such errors and omissions "arising out of Bodily Injury[.]" (Doc. 10–2 at 113).

Lexington argues that this exclusion applies because "the claims in the *Coley* action . . . are dependent on and thus necessarily arise out of Benton's death." (Doc. 30–1 at 24). According to Lexington, "the term 'arising out of' is given broad application under Ohio insurance law," such that all of the *Coley* claims arise out of Bodily Injury.

Clarendon, in contrast, contends that the exclusion does not apply because none of the wrongful acts arises out of Benton's death. (Doc. 32–1 at 30–31).

Relying on *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540 (2011), Clarendon argues that the term "arising out of" has a narrow meaning under Ohio insurance law. In that case, the Ohio Supreme Court held that an exclusion in a homeowner's policy for injuries "arising out of" premises that the insured owned, but that were not insured under the policy, applied only if the condition of the uninsured premises "caused or contributed" to the injury for which coverage was sought. *Id.* at

544. That an injury happened to occur on the uninsured premises, in contrast, would be insufficient to make the injury "arise out of" those premises. *Id.*

Applying *Hunter* here, Clarendon contends, means that the Bodily Injury exclusion applies only if the Bodily Injury at issue – Benton's death – caused or contributed to the wrongful acts committed by the *Coley* defendants. But because it was the wrongful acts that caused Benton's death – and not the other way around – Clarendon contends the exclusion does not apply.

In reply, Lexington – no longer claiming that the Ohio courts give the term "arising out of" a broad construction – argues that *Hunter* actually supports its position. (Doc. 33 at 20–22).

"An  exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." *Hunter*, *supra*, 128 Ohio St. 3d at 543 (emphasis in original). As the Ohio courts have explained, "[f]or an exclusion that uses the term 'arising out of' to apply, there must be a causal relationship between the injury and what is excluded." *Cincinnati Specialty Underwriters Ins. Co. v. Larschied*, 2014-Ohio-4137, ¶24.

For the exclusion to apply, I must find that the Bodily Injury"– Benton's death – "caused or contributed to," *Hunter*, *supra*, 128 Ohio St. 3d at 544, the wrongful acts, or that the wrongful acts were "causally related to" Benton's death, *Penn Traffic*, *supra*, 99 Ohio St. 3d at 233. But that is a logical impossibility because the *Coley* complaint alleges that the wrongful acts caused Benton's death.

Resisting this conclusion, Lexington contends that "[e]ach of the claims of the *Coley* action are dependent on, and thus necessarily arise out of, Benton's 'bodily injury,' i.e., Benton's death." (Doc. 30 at 2).

Perhaps it is the case that all of the claims "arise out of" Benton's death in the generic sense that Benton's death is the core operative fact that the claims have in common. *Cf. Lenard v. City of Cleveland*, 2017 WL 2832903, *5 (N.D. Ohio) (discussing "arising out of" in context of supplemental jurisdiction); Fed. R. Civ. P. 13(a)(1)(A) (compulsory counterclaims are those that "aris[e] out of the transaction or occurrence that is the subject matter of the opposing party's claim").

But Ohio insurance law gives that term a different, more restrictive meaning: it requires that what is excluded "cause or contribute to" the injury, wrong, or damage. That means that the Bodily Injury must cause or contribute to the wrongful acts, yet in no sense did Benton's death at the hands of Schmeltz and Grey cause or contribute to Schmeltz's shove of Benton from behind or Gray's use of a choke hold. Indeed, taking that position would require me to find that effects produce causes.

For these reasons, I conclude the Bodily Injury exclusion does not apply to Counts One through Six of the *Coley* complaint.

However, I agree with Lexington that the Bodily Injury exclusion applies as to the remaining claims in Count Seven, alleging conspiracy, civil RICO, and aiding and abetting. These claims "arise out of" Benton's death because it was Benton's death that motivated the defendants to commit, and contributed to their decision to commit, the wrongful acts alleged in Count 7 – i.e., lying to the FBI and submitting false reports designed to cover up their use of excessive force and failure to treat Benton.[4]

---

[4] In light of this holding, I need not decide whether a separate exclusion in Lexington's policy, for Public Officials' Errors and Omissions arising out of an insured's fraud, dishonesty and bad faith, also excludes coverage for the claims in Count Seven.

**D. Whether the 2008–2009 Lexington Policy Applies**

Finally, Lexington argues that, even assuming that its policies "potentially respond to the *Coley* litigation . . . only one policy would be triggered." (Doc. 30 at 2).

This argument relies on language in the "Limits of Insurance" section of the policy stating that "Public Officials' Errors and Omissions arising out of a Wrongful Act which takes place over more than one Policy Period insured by [Lexington] shall be deemed as arising from a single and the same Wrongful Act[.]" (Doc. 10–2 at 115). The policy also states that "[n]o Public Officials' Errors and Omissions arising from the same loss or series of facts may become manifest in more than one policy period." (*Id.*).

According to Lexington, "all of the claims of the *Coley* action 'arise from' the same 'loss' and 'series of facts' i.e. Benton's death (the 'loss') and the alleged acts and/or omissions surrounding his death." (Doc. 33 at 29).

Clarendon's briefs do not address this issue, and I therefore find that it has forfeited any argument in response. Furthermore, I agree with Lexington that, in light of the policy's plain language, only one of its policies – that for the policy period from April 1, 2007, to April 1, 2008 – responds to the *Coley* action.

**Conclusion**

Because the 2007–2008 Lexington policy requires it to contribute to the expenses incurred in and the settlement of the *Coley* litigation, Clarendon is entitled to summary judgment on its claim for equitable contribution and to a declaratory judgment.

I cannot enter a final judgment at this juncture, however, because it appears the parties have agreed that, in the event I denied Lexington's motion for summary judgment, Lexington would have

an opportunity to raise issues of "untimely notice" by Lucas County and the alleged prejudice this caused Lexington. (Doc. 30–1 at 14 n.6).

It is, therefore,

ORDERED THAT:

1.    Lexington's motion for summary judgment (Doc. 30) be, and the same hereby is, denied;

2.    Clarendon's counter-motion for summary judgment (Doc. 32) be, and the same hereby is, granted; and

3.    The clerk shall forthwith set this case for a telephonic status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
